Good afternoon Mr. Davis, you have four minutes for rebuttal, you can begin whenever you're ready. Tiberius Davis on behalf of the United States, Congress specifically defined an applicant for admission as an alien present in the United States who has not been admitted or who arrives in the United States. Petitioner concedes that he is an applicant for admission. Elsewhere in 1225b2, Congress then mandates that for an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained. Petitioners concede that that subsection requires detention without a bond. Thus, by the plain text and structure of 1225, petitioner must be detained without a bond hearing. Why isn't the fact that seeking admission is not defined by the statute significant? They could have just used the term applicant for admission a second time in that same sentence, and yet they used seeking, which is obviously an active word. Why shouldn't that be significant? So I think a lot of responses. I think one, it is just a verb of applicant for admission. It's what they're doing. As the Fifth Circuit said, somebody who is an applicant for college admission, even though they're not actually doing something. I was thinking about that analogy. It's not the greatest because this applicant for admission is a term of art, and it includes people who are just in the United States who haven't applied for anything, right? So another judge used the example, if someone sneaks into a movie theater and they're in the theater already, who would say they were seeking admittance to the theater? Nobody would say that, right? Well, I think this goes to the definition of admission, which is lawful entry after inspection and authorization. And they were not inspected. They were not authorized. So they're still applicants for admission. Is an applicant for admission applying for admission? I think they are similar. I think seeking or applying for admission is somewhat broader, and I think A3, subsection A3, really shows that. And subsection A3 says that all aliens who are applicants for admission or otherwise seeking admission or readmission shall be inspected. So the or otherwise clause of seeking admission or readmission. Before or otherwise, just the BIA in a matter of YMP in 2012 said, I'm quoting, being an applicant for admission under 1125A1 is distinguishable from applying for admission to the United States, where an alien does not contend that there's any basis for her admission and is instead requesting that the attorney general exercise discretion to cancel her removal. So there's at least a published agency decision expressly distinguishing between applicant for admission and applying for admission. Does that matter for your argument? I don't think so. I mean, if we're looking at agency decisions, the BIA and Hurtado completely agrees with our interpretation of B2 and thinks that seeking admission is only somewhat slightly larger and is a catch-all for applicant for admission. And I think A3 creates that relationship. And if you take Petitioner's interpretation literally. So or otherwise, which is the A3 language, there's a lot of water under the bridge in terms of what that language can mean, dictionary definitions and case law. There are different possible meanings to or otherwise. I think the one that you put forward is a possible meaning depending on the context. But so is or. And we have cases that, and the Supreme Court has cases that understand or otherwise simply to mean or. And why isn't the overall context of this provision comparable with that? I think a couple of responses, Your Honor. One is that just reads out otherwise. They could have just said or. And in fact, there's meaningful variation. In that very same subsection, they say or transit through. So Congress knows right there how to use the disjunctive or. Let me ask for example, if you have an act that bars patents on any invention that was, quote, in public use or sale or otherwise available to the public before the effective filing date of the claimed invention. So then could or otherwise there simply mean or? I think that that could be a catch-all, too, without looking at the statutory text and could include the things that came before that are examples. That was the argument the plaintiff made. It's a Supreme Court case called Helsin. And the court rejected that argument and said, like other phrases, otherwise available or otherwise available to the public captures material that does not fit neatly into the statute's enumerated categories, but is nevertheless meant to be covered. So I think given the meaningful variation where Congress in that exact same subsection used or without the otherwise or shows that they meant this to be a connection and to have a catch-all. And I think I would point you to Villarreal, which is the en banc 11th Circuit case that dealt with very similar arguments and said that if you read otherwise to just be the disjunctive or, that would render that superfluous. And as a catch-all, it doesn't matter that the things that came before are arguably superfluous. Those are examples. Those set the baseline. It's ironic you're suggesting that it renders something superfluous there. But when I said seeking admission is superfluous, you said you told me, no, that doesn't matter. Well, I think It matters or does not matter. Why doesn't it matter that they used a different term, seeking admission, in the actual statute that we're talking about? We'll get other statutes, but in the statute that we're talking about, they used a different phrase when they didn't need to. So again, Your Honor, I think seeking admission is simply the verb of applicant for admission. Why wouldn't they just say applicant for admission again? I think because they're describing what that person is doing. I think you could use that logic in a lot of other places. And I think if we're talking about overlap or redundancies, again, Barton versus Barr, plenty of Supreme Court cases say that's not a silver bullet, especially where there's overlap and redundancy on the other side. Well, why shouldn't we have the Supreme Court's understanding and Jennings' help guide us if there's any doubt as to what they meant? Five justices said U.S. immigration will authorize the government to detain certain aliens seeking admission into the country under 1225 B1 and B2. And then it said it authorizes the government to detain certain aliens already in the country, which is what we're talking about here, pending the outcome of removal proceedings under 1226 A and C. So why shouldn't we use that for help? Well, for a couple of reasons. I think Jennings actually, the holding favors us, which there it was rejecting a similar argument to what plaintiffs said. Before you talk to the holding, that's pretty clear to me. You know, we can talk about the holding, what the circumstances were and how they may or may not differ from here. But here they're telling us how to look at this framework and this clearly suggests that the petitioner here is under 1226 A and C. So I respectfully disagree, Your Honor, and for a couple of reasons. Is it wrong? Well, no. So I'll tell you why. And that is how every administration until now has interpreted the provision, correct? So there has been a long practice of not enforcing it. I think Texas was— Wait, wait, wait. Hold on. In 1997, the Department of Justice said there wasn't a practice of not enforcing it. It said despite being applicants for admission, aliens who are present without having been admitted or paroled will be eligible for bond and bond redetermination. Isn't that the DOJ interpreting the statute at the time? So I think if you look at the CFR, Your Honor, this shows that the executive has not been completely consistent on this. And the CFR was passed right after the law came out. And the CFR—let me get the number for you. I mean, every—all five administrations have never believed that there was mandatory detention for someone who's already in the United States, right? When did the administration come out and say— although any administration, any entity, agency in the United States government will come out and say people who are already in the United States are mandatory subject to detention? So first off, I think the fact that the executive has not followed the law previously is not really relevant. Ferreira v. Sessions from the Supreme Court makes that clear. Villareal makes that clear. Even so, I think in 1997, right after Arriva was passed, if you look at 8 CFR 235.3b1, subsection 2, it makes clear that this is for expedited removal. If people who are physically present in the United States in expedited removal show that they've been here for consecutive two years, they get taken out of expedited removal. And then it says that those people immediately prior to the date of determination or indivisibility shall be detained in accordance with section 235b2. Petitioner has no explanation for that contemporaneously passed regulation that says for people who show they've been here for more than two years under expedited removal who are physically present, if they show that, they're out of expedited removal and they shall be detained under b2. Those are people physically present in the United States. So you're saying the government at the time understood this to be a mandatory provision? I think there are some indications of that, yes. And the government in the five administrations didn't follow that mandatory requirement? Yes. Can this government not follow that mandatory requirement? So I think this goes to the Texas versus Biden point, Your Honor, which there, there was an allegation by Texas that... But what's your answer? What is the government's answer? As a practical matter, what is your view of your requirement to detain? Do you have... It's not about whether you may or not, but do you understand the government? Does the government understand itself to have any ability not to detain someone who's here without having been admitted? So I think to faithfully execute the laws, we should detain them, but they can get parole. Parole is something that had been used a lot by the last administrations in these very circumstances. So there is a way to parole people, but I do think when those circumstances apply, these people should be detained. And I would point, Your Honors, again to Texas versus Biden, where Texas was saying that under 1226C, which everybody agrees is mandatory detention, the Biden administration was not mandatorily detaining everybody in the Supreme Court. So aside from parole, is it your view that the government can decide not to detain someone under this provision? I think just for resource constraints, and I think it'd be hard for somebody to have standing, but I think to faithfully execute the law, they should try their best to do so. So if there are resource constraints, you have prosecutorial discretion? I think for the same reasons that Texas versus Biden said, under 1226C, which everybody agrees is mandatory. Can I ask, at the time the law was passed, do you have a sense of the number of noncitizens who would have fit within this category? How many people would have faced mandatory detention under this provision in 1996 and 1997? I don't know the exact number, and I think it would be hard to know for certain. I believe Petitioners have a number that says about 2 million. That number has obviously increased because they have not been applying that detention, and it compounds over time. More people enter, they're not detained. You're saying there would have been at least millions, right? You don't have an exact number. Likely, at the time. And Congress at the time, with respect to 1226C, was expressly concerned, were they not, about the resources available to the agency to detain what was then estimated to be 45,000 people under 1226C, and gave the Attorney General the ability to delay implementation of the act until that 45,000 approximated number could be, the government could have the resources to detain them, correct? So, I don't think anybody knows exactly why Congress did one thing for one and not the other, but But fair to say, it's thinking about resources, and the delay provision was meant to give the government the ability to have the resources to detain those number of people who would then fall under 1226C, right? So, I think here are three reasons that 1226C might be different in that regard. I understand the difference, but it's just a factual question. But, I'm not sure that that's exactly why, but yes, they did have a delay for 1226C. And, but no comparable discussion in the history, or no comparable provision with respect to needing to mass detain hundreds of thousands, if not millions of people, correct? I think that's because with regard to resource constraints, the reason 1226C exists is that Congress was doing a belt and suspender. They're saying, we understand you can't get everybody, but these are the people that we want you to focus on, human traffickers, drug traffickers, terrorists. They need to be detained. We're telling you they don't get parole. And also, we have a better sense of where those people are. You're saying Congress is telling the executive they must detain everyone deemed an applicant for admission? Correct. Without any concern to where a million people would be mass detained? Well, I think, again, they can be given parole, and I think the resource constraints mean that even now, we obviously don't have everybody detained. And again, under Texas versus Biden, not even everybody under 1226C, which everybody agrees is mandatory, was detained for this very reason. But I think Congress was focused on 1226C in the delay because those were people that the states had in custody that Congress wanted them to go out and try to get detainers for, and because those were people that, for the most part, had convictions for very serious crimes and so couldn't simply be detained with the normal population of immigrant detainees. So that requires special circumstances, special detention facilities to handle people who are drug traffickers, human traffickers, terrorists. But the difference between Mr. Barbosa under this, under the government's current interpretation and the prior interpretation, under the prior interpretation, if he's determined not to be a flight risk or a danger to the community, he's released on bond, right? Because of a regulation, yes. If he is a flight risk or a danger to the community, he can be detained. Because of a regulation, correct, not because of the statute. And so the delta between the current interpretation, the government's current interpretation and the prior interpretation are people who are, who will be detained, who are not a flight risk and not a danger to the community, right? Well, neither 1225 nor 1226 says that those are substantive considerations under the statute. Just asking as a factual matter, the difference between who would be detained previously and who would be detained now, I think the only difference are people who would otherwise establish that they are not a flight risk and not a danger, as a factual matter. Pursuant to a regulation under 1226A, yes. Okay. And what is Congress's purpose in detaining those people? Well, I think it goes back to the whole point of ERIRA, which is beforehand there was a distinction between exclusion at the border and deportability in the interior. And as Congress had said, including in the House report that Petitioner cites to just four pages earlier, they were trying to get rid of the disparity and the incentives that were set up by this disparate situation. And combining exclusion and deportation all into removal, but does it tell us the answer to whether, what happens with detention, right? That's the question, not the answer. Well, no. I disagree with that. I think this is part of removal proceedings. I think that Jennings connects the two. But they want to make certain changes without wanting to detain everybody who's already in the United States, right? That doesn't necessarily follow the fact that they're making certain changes to have more equal treatment means that they wanted everybody to be detained, even if they've been in the country for years and years and years. So I disagree. I think that is why they put 1225A1 in there. That's why they have that definition. Can I ask you about that? A word that doesn't get a lot of attention in 1225A1 is deemed. Do you know what deemed means? Does the government have a definition of deemed? I think that that means that Congress is, for legal purposes, deeming these people applicants for admission. Yeah. So and deemed under blacks means it's creating a legal fiction to treat something that it's not as if it were. And so what I understand 1225A1 to be doing is deeming, treating people who are not seeking admission to be applicants for admission. Isn't that what 1221A is doing? I think by deeming them applicants for admission, it's also deeming them to be seeking admission when they're not. It doesn't say that, though. Textually, it doesn't say that. It just says applicants for admission. I think subsection A3 makes that connection quite clear. And can I point to another section that I think makes this clear? So one example petitioners point to where they say this is a person who could be seeking admission, but is not an applicant for admission. Actually, somebody who could be an applicant for admission, but not seeking admission, is somebody who is a lawful permanent resident who shows up at the border. They're an applicant for admission, but they're not seeking admission in their view because they've already been granted admission. But if you look at 1101.13, it explicitly defines lawful permanent residents as not seeking admission, which means that Congress felt that they needed to expressly exclude them from the default of them being seeking admission. But then it says unless, and it gives several exceptions, including an exception for some of the same crimes in 1226C where that person is thus seeking admission. So I think the default is these people are seeking admission even if they're not actively doing something, including based on some of the crimes in 1226C. Can I ask about this legal fiction? If you, so it deems someone an applicant for admission. Can that person, I just want to know how far that fiction can go. Can that, what would it, can that person withdraw their application for admission? I think until they're in proceedings, yes. And I think there's voluntary departure, too. I think they are allowed to leave the country. And I think that's what A5 or A4, I believe, indicates is that the people who are applicants for admission can withdraw because they're seeking admission. Well, A4 says an alien applying for admission may in the discretion of the Attorney General at any time be permitted to withdraw the application and depart immediately from the United States. So what you said is they could depart immediately from the United States. What, how would they withdraw their application? I think by departing from the United States. So under petition So you read that out of the A4 as well, withdrawing the admission? I think they are withdrawing by leaving. And I think if you look at petitioners' view, they say, well, these people aren't lawfully entered because they haven't entered the country. But then what are they departing from? They're in the country. They're still seeking admission because they're in the country as applicants for admission. And they're departing the country. Like Mr. Barbosa, he's not seeking admission. He's applying for asylum. Right. He is because he's an applicant for admission who has not removed. And by 1225, A1 deems him an applicant for admission, which is seeking admission. And again, I think I agree back to the Well, it's just that step. I mean, you say that step, but textually, that's not what A5 does. And it doesn't really make sense with the rest of the statute. Well, I think A4 does, too. It makes this connection of the verb that they're seeking admission. No, what A4 shows is that the fiction, the deeming doesn't fit everything. Because it's fanciful to say that someone deemed to be an applicant for admission who has no application for admission pending, never did, can somehow withdraw their admission. Sure, they can depart from the United States. That's what A4 says. But A4 says permitted to withdraw the application for admission. It shows perfectly clearly, I think, there, that the deeming doesn't mean every time the word admission, or seeking, or applying is used, doesn't mean you sub in this legal fiction. It doesn't work overall. Are we to try to understand the statute as a whole, and how the complicated pieces fit together? Yes, but I think if you take a step back and you realize that in 1225, A1, Congress included this express definition, what work is that doing under their definition? It's not doing any work under their definition under A4, under A5, or B2. It's not doing any work. So, they're reading out this definition that Congress started in 1225 out of it. Not for detention, but for removal, it's doing a ton of work. I respectfully disagree. Why? Okay, so it's pretty odd to put 1225 A1's definition there, when the only work it's doing is in 1229C. And 1229C, they could have just put the definition there. They could have just said removal, which applies to people at the border and the interior. I'm going to ask you about the Lake and Riley Act. Why would they have needed to add those offenses if they were all subject to mandatory detention prior to the Act? Why would they have needed to do that? Because I think under Texas v. Biden, the previous administration was not enforcing even 1226C against these people. And I'll also note that the ones that they added, which is 1226CE, those people are a subset of those already covered by expedited removal. So A6 and A7 are already covered by expedited removal, so there's overlap regardless. Why isn't this situation similar to the tariff case? They, in their 28-J letter, noted that Chief Justice Roberts, joined by Judge Sissons, Gorsuch, and Barrett, said the fact that no president has ever found the tariff power is strong evidence that it does not exist. So isn't that the same situation here, that for five administrations, nobody thought the power to detain in a mandatory way extended to all individuals who were already in the United States? And that, so isn't that strong evidence that the power does not exist? I'd like to briefly finish the answer to the Lake and Riley point, which is that also restricts parole, and Congress explicitly added liability in 1225 for not mandatorily detaining people under B1 and B2. And under our view... It could have done that. It could have done that without also having provision adding the sections. It could have created liability, could have done other things, but it also added them to the exemption, which wouldn't make sense. But can you just answer my question about, and there are other cases, Justice Barrett and Biden in Nebraska said a longstanding want of assertion of power by those who presumably would be alert to it, exercise it, may provide some clue that the power was never conferred. So they never raised major questions doctrine, and I'll just briefly note that learning resources, there was only a majority for the statutory analysis, not the major questions. But major questions doctrine always starts with the text and context, which we've been talking about and I think strongly favors us. Why is it, if there's 300, over 300 district judges who have come out the other way? We're two in all in the Court of Appeals, Your Honor. I think that says a lot too. You would agree, it's not so clear, right, that we shouldn't look to other clues. And some of the clues are what the Supreme Court said in Jennings, and our law is actually a great deference to Supreme Court dicta, and the fact that no administration's ever thought that this power existed. So I'll try to take all of those points in turn. First, I don't think this is a major question, because the only dispute is whether they fall under 1225 or 1226. And under 1226, we can detain them. It's just that there's a regulation giving them bond. That's really the only dispute. The dispute is whether Congress gave the government the power to mass detain millions of people who've been in the country without an opportunity for release on bond. That, if the Constitution protects liberty, then that grant of power is certainly a major question. I disagree, Your Honor, because if we repealed the regulation for 1226a, we could also, with our discretion, fully detain the same people. But 1225 is actually taking discretion away, which is contrary to most major questions doctrine, which is about a delegation of discretion. And I would like to briefly turn back to Jennings to answer that question. Again, most of what they point to is dicta in the background, but there's dicta for everybody in this case. So if you look at 287, it says applicants for admission must be inspected by immigration officers to ensure that they may be admitted into this country. Then it says applicants for admission fall into one of two categories, those covered by B-1 or B-2, no mention of 1226. But under their view, a lot of the people who are deemed applicants for admission fall under 1226, and 1226 says nothing about applicants for admission. Not once does it even say the phrase. Also, if you actually, it also says that, and this is the same part of Jennings, Section 1225b-2 is broader. It serves as a catch-all provision that applies to all applicants for admission, not covered by B-1. But by their reading, 1225b-2 is much narrower than B-1. B-1 is essentially swallowing most of that.  Let's give them a chance and give some time for rebuttal. Thank you. Can I just point to one? I'll do it on rebuttal. All right. We'll hear from Mr. Tan. May it please the Court, Michael Tan on behalf of Mr. Barbosa de Cunha. So there's a lot of ground to cover here, Your Honor, but I want to start with three points. First, the government's detention policy violates the statute. Section 1226 governs the arrest and detention of noncitizens living inside the country, like Petitioner, and allows their release on bond. By contrast, 1225b-2 requires the detention of noncitizens who are processed while seeking admission at the border. As Judge Bianco pointed out, the Supreme Court recognized this in Jennings against Rodriguez, as did the Solicitor General. And this is clear from the text, structure, history, and 30 years of practice by five administrations. Second, it makes sense that Congress preserved bond for people like Mr. Barbosa de Cunha. Petitioner has lived here for more than 20 years. He has no criminal record. He's raised two U.S. citizen children. He owns his own construction company. He's been known to the government for about a decade when he applied for asylum in 2016, and he's even received work authorization. Mr. Barbosa de Cunha is typical of the people that the government is sweeping up into its new detention policy, even though they're the least likely to pose a flight risk or danger. Congress sensibly allowed for release on bond in these cases instead of requiring detention at enormous taxpayer expense. And that's consistent, as Judge Nathan pointed out, with the Supreme Court's recognition for more than a century that non-citizens who've entered the country are entitled to greater protections than those at the border. Finally, Congress does not hide elephants in mouse holes. The government claims that Congress in 1996 enacted the largest mandatory detention scheme in U.S. history, requiring the detention of millions of people, and somehow no one noticed for 30 years. But nothing in the text... I think is that because those two major questions factored, or just elephants in mouse holes factored? So we're not relying on major questions, Your Honor. We're relying on elephants and mouse holes. But we do think a number of related principles of statutory interpretation that underpin major questions favor us here. Both elephants in mouse holes, the fact that this is an unheralded power, the fact that it flies in the face of 30 years of administrative practice, the fact that they're seizing on a statute that naturally applies to the border to enact the largest mandatory detention policy in U.S. history. And, you know, you mentioned the history that sort of informs this. Earlier, we know that Congress used a scaffold when it enacted mandatory detention in 1996. It focused on targeted and limited groups of aliens, criminal aliens at 1226C, people in the expedited removal process at the neighboring provision in 1225E1, people with final removal orders at 1231A2. It did not, Congress did not enact a mandatory detention scheme for millions of people as well. And we know that because, as Your Honor pointed out, when Congress enacted the mandate for criminal aliens at 1226C, it deferred implementation for two years because it was so concerned about the impact that would have on the system. They were looking at maybe 45,000 people under this mandate every year. They directed the agency to open 500 new detention beds. There's no way that same Congress enacted a mandatory detention scheme for millions of people. If you do that, you don't add nearly 500 beds to the system. It just doesn't make any sense. So I want to turn next to the text of 1225B2 and point out the flaws in the government's argument. And here I think it's important to start with the text itself, as always. So 1225B2 says, in the case of an alien who's an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a removal proceeding. So Congress's use of the phrase, in the case of an applicant for admission, followed by an alien seeking admission, makes clear that the focus here is on applicants for admission who are seeking admission. Now, the government makes two key mistakes. First, as Judge Bianco pointed out, it gives the terms their ordinary meaning, citing how a college applicant is seeking admission to college. And second, it makes the reference to seeking admission superfluous by arguing that applicants for admission are necessarily seeking admission. But this is the Immigration Act, where words have technical meaning, and we're dealing with two distinct terms of art that Congress used deliberately. So starting with applicant for admission, Congress deemed aliens applicants for admission simply when they're present here without having been admitted. That's at 1225A1. And as... What do you understand deemed to mean? Right. So this Court has actually explained what deemed mean. Deemed means to treat something as if it were really something else, or it has qualities that it doesn't have. And that's the Shi Yanlin case against Department of Justice from 2007. It was an in-bank decision about IRA-IRA. That's right. That's right, Your Honor. And so that means here, Congress deemed people applicants for admission even when they're not actually seeking admission. Then in 1225B2, Congress went on to make being an applicant for admission a necessary but not sufficient condition for detention. Instead, Congress said you have to be seeking admission as well. So what's seeking admission? Seeking is not defined by the statute, so it's given its ordinary meaning, looking for, trying to gain. Admission is defined by statute to refer to an authorized entry into the country upon inspection. And that's at 1101A13A. So seeking admission describes someone who's seeking to enter at the border upon inspection by an immigration officer. It doesn't describe a person like Mr. Barbosa-Dacuna, who entered the country more than 20 years ago and is arrested inside the country after living here for decades. This is in keeping with the history of 1225B2, which, as explained in the law professor's brief, has required the detention of people inspected at the border for more than 100 years. And again, it's in keeping with the Supreme Court's description of the statutes in Jennings, which recognize that 1225B2 applies to people at the border, while 1226 applies to people, like Petitioner, arrested in the interior. To address sort of a 30,000 foot, why would Congress require detention of people who do present themselves at the border, but not require detention of people who've come in without detention? Sure. So as an initial matter, we think the text is clear. But as to the congressional purpose here, I think it makes policy sense in that the government often doesn't know very much about new arrivals at the border. But for people who are here rooted in family and community, the facts that go to bail risk are readily available and can be heard at a bond hearing. I want to make a few other points, which the government makes this whole point about why would Congress reward it. It's a logical distinction where what the government needs is data to make assessments about future dangerousness, about dangerousness and flight risk. And you've got people who've just shown up. They're detained while it's gathering any of that relevant data during the pendency and removal doesn't have that. It doesn't have that data. But people who've been here for over two years, at least, but often for extended periods of time, often with work authorization and the like. That's right. Established homes and families. You're saying because that data is available to make an assessment in a bond hearing, that distinction makes good sense. In addition to this sort of historical constitutional distinction between what to report to people who are present in the country versus those who show up at the border. That's right, Your Honor. Exactly. And I think that's evidenced by the bond hearing in this case, where when petitioner was finally received his bond hearing, he was found by an immigration judge not to be a bail risk and released on bond. I will say the government is also over-reading the legislative record when it sort of says there's no way Congress could have preserved bond hearings for people in Mr. Barbosa-Dacuna's situation. All they cite is a single line from the committee report that talks about changing certain aspects of the prior immigration scheme, specifically the rules for removal proceedings. That sentence doesn't say anything about detention or bond. And in fact, when the committee report and the conference report do address detention, they say the opposite. They say that Congress was restating the existing rules on detention and bond for people in Mr. Barbosa-Dacuna's situation. Can you spend a moment on 1225A3 and the otherwise seeking language that Judge Nathan and Mr. Davis were discussing? Sure. Happily, Your Honor. So as you know, the government hinges its textual argument on this phrase or otherwise, arguing that it makes applicants for admission a subset of people who are seeking admission. That can't be right, because the statute recognizes that some applicants for admission aren't seeking admission. And so in our view, or otherwise describes an overlap between sets, not a set and a subset. And I think the best way to illustrate this is to provide an example. It's actually the example my friend cited earlier of the lawful permanent resident who's returning from a trip abroad. So if the Court will bear with me, the statute deems a returning lawful permanent resident an applicant for admission when they arrive at the airport from their trip. And that's because they arrive in the United States at a port of entry. That's set forth at 1225A1. That also means they have to be inspected at the airport. That's under 1225A3. However, returning LPRs generally aren't detained. And that's because in most cases, they don't meet the second condition of seeking admission. Another provision that my friend cited says that a returning LPR isn't seeking admission unless certain special circumstances apply. Like if the person was abroad for more than six months, or they committed a crime that makes them inadmissible. And that's at 11A13C. Only in those circumstances can the officer regard the return LPR as seeking admission and detain them. So that makes clear that there are applicants for admission who aren't seeking admission. And so in our view, the more faithful reading of A3 is that it requires the inspection of all applicants for admission, those who are seeking admission and those who aren't, as well as any other alien who's seeking admission, readmission, or transit through the United States. So the or otherwise is describing an overlap between those terms instead of a set and a subset. And it clarifies that some applicants for admission are seeking admission while some aren't. I think if it just said or maybe, if it was just in the disjunctive, the provision might create the misimpression that maybe applicants for admission are never seeking admission or that applicants for admission and alien seeking admission are discrete sets. But the reality is that there's an overlap. Some applicants for admission will be seeking admission, some aren't. What does or otherwise mean? What language would you substitute in to give the meaning for or otherwise that you're describing? It's hard to find a synonym. Well, I think what it's doing is indicating that what I just said, which is that some applicants for admission are seeking admission and that some aren't. I can point to another example in the US Code that maybe helps make this clear. At 40 USD 14505B, this is the statute for the Appalachian Regional Commission and involves the economic development activities of the commission. That empowers the commission. It says the commission may enter into contracts or otherwise provide amounts that promote economic development. So there or otherwise is, again, describing an overlap because some contracts will involve monetary amounts, some will involve technical assistance, other services. And so it's not that all contracts are subsumed under the larger set of provide amounts. So we think that it's just describing an overlap between these two sets, not a set and subset relationship. I don't know if you're familiar with Justice Thomas's opinion in health care, which is the American Vents Act that I was asking Mr. Davis about. I think that's a similar interpretation of or otherwise that you're referencing. I don't know if you're familiar with that. Maybe, Your Honor, I'll confess I'm not familiar with it. I feel quite sheepish about that. But of course, that's the work we think that or otherwise is doing here, that this is describing an overlap between sets. I just wanted to... I'm sorry, Your Honor. Of course, of course. What's the current status of the petitioner? So he was... Where is he? I'm sorry. Yes, Your Honor. He was released on bond when he finally received his bond hearing. So he's returned home. And he is in ongoing removal proceedings. His individual merits hearing is before the immigration court in Massachusetts next summer in June of 2027. So he's resumed his normal life with no incident. Yes. I just want to return briefly to congressional purpose, if I may. So I also think just another aspect it's important to kind of train the court's eye on is that Congress wasn't only looking at illegal entry, was certainly looking at that. But it was also looking at where it was going to take the extraordinary step of putting people into mandatory detention with no hearing to assess flight risk and danger. And so I just want to reiterate again, we know Congress used the scalpel and it created explicit and limited mandates for certain groups of people, but not the kind of broad detention mandate for millions of people like petitioner who have lived here and are deeply rooted in their family and community. If you have it, so I'm sorry, Your Honor. Could I ask you, you put a little bit less emphasis than some of the courts that have gone your way on the superfluidity argument with respect to 1226C. Do you still rely on that argument? We do. And thank you, Your Honor. That's where I was going to turn next, actually. So the other major flaw with the government statutory analysis that actually nullifies entire parts of 1226. So the government's position is that 1226 provides bond only to aliens who have been admitted to the country, essentially people who have been let in on visas. But that writes out the parts of 1226 that apply to inadmissible aliens like petitioner. That includes subsection A of 1226, which- I'm sorry, can I interrupt just as you say that? So the government's theory then, if somebody enters lawfully but overstays their visa- That's right. Or lied in their visa application and overstays, they get a bond hearing, right, under the government's theory. So the idea that this interpretation somehow creates, you know, Congress gets to sort of treating everybody the same or something like that, that can't be true, can it? That's right, Your Honor. So people who overstay their visas, and of course that's a significant number of people, even under the government's reading, continue to receive the benefit, if you want to think about it that way, of a bond hearing because of the government's theory. Is there any rationale for distinguishing between Mr. Barbosa and someone who paid and overstayed their visa that- No, we don't see one. We don't see one, Your Honor. So the government's, as I was saying, the government nullifies A, subsection A, but it also, to get to your question, Your Honor, it nullifies the parts of subsection C that apply to inadmissible aliens. The provision expressly refers to inadmissible aliens at C-A and C-D, as well as C-E, which is the provision added by the Lake and Riley Act for people who are present without admission, people in petitioner's very situation. Subsection C is also the provision that proves the rule. It reinforces that 1226 provides bond to inadmissible aliens because otherwise, Congress wouldn't have had to carve them out from the statute in the first place. So one of the responses to that is, yeah, sure, there's some overlap, but there's also some differences. It's actually similar to the previous argument about superfluidity. So I think the government's argument is, well, humanitarian parole is still available to this category of people, including without 1226-C, parole would be available to people who commit the enumerated crimes. Why isn't that a response to that argument? Yeah, so respectfully, Your Honor, we think that mangles the statutes. So the Supreme Court in PREACT made very clear that 1226-C is an exception to 1226-A, meaning it only imposes mandatory detention on people who were detained under 1226 in the first place. And that's clear from the text of the statute itself. 1226-A says it permits detention and bond except as provided in subsection C. So you don't get C without A. By contrast, neither 1225-B2 nor the parole statute contain an express statutory exception for people covered by 1226-C. That reflects what the Supreme Court found in PREACT, which is that 1226-C applies only if you're detained under 1226 in the first place, not 1225. So the government is simply wrong that 1226-C can kind of come into the picture and eliminate parole. If the government is right and people who are present without admission are detained under 1225-B, that means they're eligible for release on parole as well, even if they've committed a predicate crime that would have triggered 1226-C under the existing or the prior regime, rather. I see I'm over time, but I did want to address a few more points with the court's indulgence. So two more points, Your Honor. Actually, three, if it's all right. So first, the government cites the regulation at 235.3, referring to the expedited removal context, as far as we've been able to determine that regulation has never been implemented or applied and flies in the face of the bond regulations that the executive has consistently applied for 30 years, which makes bond and bond hearings available to people in Mr. Barbosa-Dacuna's situation. That's the first point. The second is the point about warrants. So the text of 1226 requires arrest warrants. 1225b2 doesn't. We think that's further evidence that 1226 governs inside the country, where arrest warrants are ordinarily required. And in fact, in this case, the government arrested petitioner on a warrant issued under 1226, which further supports 1226 being the governing statute. That's at the appendix, page 40. The last point I'd like to make is about constitutional avoidance, which we addressed in the briefs that I want to briefly talk about here. So our first line of argument is we think the statute is clear, but at a minimum, if the court concludes that the statute is ambiguous, we think it's fairly possible to read 1226 to apply here. And so we would urge the court to apply constitutional avoidance in that case because imposing mandatory detention on non-criminal aliens like petitioner raises very serious due process concerns. This court recognized in Velasco-Lopez a case involving someone who had entered without inspection, that the interest in being free from imprisonment is the most significant liberty interest there is. If you apply the other Matthews factors, the risk of erroneous deprivation is clear here. As an immigration judge found that petitioner posed no bail risk and ordered release once he finally got his bond hearing. And this court in Velasco-Lopez recognized the government has no interest in detaining people who aren't a bail risk. So we think it's clear that mandatory detention here for non-criminal aliens raises very serious due process concerns that the court can and should avoid by holding that 1226 governs and by affirming the judgment below. Unless there are no further questions. Thank you very much, Your Honor. Thanks. All right, Mr. Davis, you have four minutes in rebuttal. So I want to start briefly with the parole point, which petitioner was saying, if 1225 applies, then that's weird because those people could get parole even though Congress in 1226C says they cannot. Our position is that the more specific controls. But the problem that they raise actually still is an issue under their interpretation because they say 1226 doesn't apply at the border. So if people have committed those crimes and are at the border, they can still get parole, but people on the interior can't get parole. That's completely backwards from their policy arguments they've been making this whole time. I also want to focus on Jennings a little bit more, if I could, Judge Bianco. If you go to page 297, and this is actually relevant to the holding, first they say that 1225B applies primarily to aliens seeking entry, and then in parentheses says applicants for admission, indicating that the Supreme Court sees parity between the two. And then it says, read most naturally, 1225B1 and B2, thus mandate detention of applicants for admission until certain proceedings have concluded. That is analysis that directly goes to the holding of the case and favors us. I would also like to note, again, that nothing in 1226 or 1225 says that one is limited to the border and one is limited to the interior. And their reading of applicants for admission means that it's doing no work in 1225, where it is used repeatedly and where it is defined. It's doing no work in B2 because seeking admission is narrower under their view and has to be met. It's doing nothing in subsection A3, especially if they read out otherwise. For some reason, most people who are applicants for admission fall under 1226 in their view, even though 1226 never uses the phrase applicants for admission at all. And to sort of illustrate their point where they say, well, people can be applicants for admission but not seeking admission, he returns to LPR. But as he noted, Congress explicitly defined that LPRs are not seeking admission. Why would they need to do that unless the default would be that they were? They didn't do that for anybody else. And then they say unless. So those exceptions are situations where they are seeking admission, including for committing the crimes under 1226C. And that doesn't mean that they necessarily have to be actively pursuing lawful status. And again, their vision of actively pursuing lawful status doesn't even include asylum. Can I ask you on the text, just kind of spelling out the grammar question, do you understand alien seeking admission to mean an alien who is seeking admission, just grammatically? I think it would be the applicant for admission who is seeking admission. By the fact that they're deemed applicant for admission, they are seeking admission until they've been given. The grammar is who is seeking admission? Yes. And I'll just note that the way admission works, right, Congress shifted away from entry. And entry is sort of the distinction that Petitioner keeps relying on, this difference between being at the border and in the interior. But Congress with admission shifted away and said it's lawful entry after inspection and authorization. Until they've been given that, they are still applicants for admission. They are still seeking admission. This can be true of the other examples they gave, such as visa waiver or people who get parole beforehand. That's not admission. And until they are actually allowed into the country, they've been not granted lawful admission. People oftentimes have visas, get to the border, and then are turned away, including for things like travel bans. So they're still seeking admission until they've actually been granted lawful entry. I'll also note that the data policy points that they're arguing about, that one reason it might be different is in the interior. Maybe you have evidence of people, of their flight risk and their danger. Nothing in 1226 or 1225 says anything about flight risk or danger. That comes from a regulation. So they're just imposing that on Congress when Congress didn't say anything about that. And they're trying to say that that's also procedural due process for the constitutional avoidance. But that's substantive. They're imposing substantive requirements that Congress did not include in those statutes. Only a regulation did. I see that I'm over my time, so nothing further, Your Honors.